## Fidelity-Philadelphia Trust Co. v. Philadelphia Transportation Co.

*Ernest R. Von Starck*, for plaintiff.
*Hamilton C. Connor, Jr.*, for defendant.

WEINROTT, J., May 11, 1960.— . . . This action by the trustee was instituted on behalf of all bondholders under the Consolidated Mortgage 3%-6% Bonds, Series A, due January 1, 2039, issued at the time of the reorganization of Philadelphia Rapid Transit Company and its underlying companies, alleging that there was net income for the payment in full of income interest to all bondholders for the years 1957 and 1958. The trust indenture provides for fixed interest of three percent each year and, in addition thereto, three percent income interest to the extent that net income is available therefor. The method for determining net income for this purpose is specifically set forth in the trust indenture. It is significant that the verbiage of this agreement, insofar as it relates to gross earnings, provides that they shall be determined in accordance with "accepted principles of accounting." However, when treating with the matter of deductions therefrom the writing makes mandatory that said deductions be in accordance with "sound accounting practice", and carefully limits the categories of deducions. This provision vests no discretion in the board of directors for it further provides that the annual income statement shall be prepared in accordance with the provision of the trust indenture.

The accounting issues raised in this matter fall into three categories of deductions or charges.

The first relates to the charges in the account entitled special appropriation to reserve for depreciation of obsolescence of track. The problem developed during the extensive modernization program of defendant's facilities over the period of 1954 to 1958 which included the purchase of 1,000 new diesel buses and the abandonment of many miles of track, for defendant company had not depreciated over $7,800,000 of the book value of the track at the time that its abandonment was effectuated. With respect to the treatment of

this item, however, defendant company apparently pursued different practices in different years. For example, in 1955 an extraordinary charge against income was made for the full amount of unrecorded depreciation applicable to track retired on its books that year. Then, in 1956 it was determined to appropriate annually to the reserve for depreciation the amount of $1,200,000 per year for the years 1956 to 1959 inclusive, and an amount in 1960 equal to the remaining undepreciated book value of the track retired in the course of the modernization program. This created a deferred charge which failed to reveal the actual deficit in the year of the loss. It is certainly unfortunate that the losses due to track retirement could not have been recovered by periodic charges against depreciation; however, the matter is not remedied by over-stating expenses and under-stating net income in subsequent periods, for the authorities are in general agreement that no deferred charge whatsoever should be set up except where costs are involved the benefit of which will inure to the future. See Accountants' Handbook, 4th Edition, by Rufus Wixon, pages 16-24.

No part of the cost involved from the retirement of the track would benefit defendant company in the future, for the benefit thereafter derived would be from the operation of the new bus lines, and would be chargeable to the cost of acquiring the same. While it is readily apparent that the deferred charge was improper insofar as sound accounting practice is concerned, there still remains the determination of the proper year in which the loss from the retirement of track should be written off. Applying the fundamental rule laid down by the expert accountants who testified on behalf of plaintiff in this case that provision should be made for losses as soon as the loss can be foreseen and the amount thereof be estimated, we have accepted

the lowest estimate of defendant itself in this regard, namely that included in its annual report.

Prior to the end of the year 1956, defendant company had received delivery of the 1,000 buses necessary to complete the conversion program and it was obvious at that point the track was rendered useless.

Accordingly, sound accounting practice required that provision be made for $7,200,000 of the total loss of $7,803,013 by the end of that year. This was the estimated loss contained in defendant's annual report for the year 1956. The proper charge for the year 1957, in accordance with defendant's own estimate of the loss from the retirement of track during that period, should have been $575,000, leaving a balance of $28,013 chargeable to track retired during the year 1959.

We will next treat with the accounting item termed franchise paving, for it is the amortization of this item that causes one segment of the dispute. About 1895, predecessor companies of defendant applied to the City of Philadelphia for supplemental franchise rights to electrify their street railway. Since these companies were delinquent in their obligation under the original franchises to pave or repave the streets upon which their lines were laid, the city required the companies to fulfill these obligations as a condition to the grant of the supplemental franchise right. When the Philadelphia Rapid Transit Company and its underlying companies underwent reorganization they sought for purposes of the rate base to capitalize $15,-000,000 for franchise paving as the amount actually spent for the cost of electrification franchise about 1895.

The Public Utility Commission initially found that franchise paving was not a cost of franchise and limited the cost of paving to the amount then in existence. Subsequently, when considering a revised plan

of reorganization the commission suggested that the proposed capitalization could be supported by increasing franchise paving without approving any specific amount. Defendant company set up this account on its books at its organization on January 1, 1940, as an asset in the paving account in the amount of $7,500,-000, which together with the overheads applicable thereto made a total of $8,201,412. In 1942 the item was held to be a cost of franchises to the predecessor company and the entire $7,500,000 was held to be includible in the rate base. However, in 1953 the commission reëxamined the item of franchise paving and concluded that there was no proof that it represented either physical property used or franchise cost. Accordingly, it refused to include any amount thereof in defendant's rate base. Moreover, amortization of franchise paving as an operating expense was disallowed by the commission in 1955 in defendant's next rate case.

The procedure followed by defendant company after the elimination of franchise paving from its rate base was to amortize the $8,201,000 at the rate of two percent per year; however, in 1955, when the extensive retirements of track began to take place, defendant allocated all of the franchise paving to the track in service at the beginning of the year and charged off the amount applicable to the track retired on the books in that year, or $844,446. The two percent charge was continued on the remaining amount in the franchise paving account and was allocated to track still in service. In 1956 and 1957 the amount of franchise paving allocated to track retired on the books in those years was transferred to a deferred asset account and defendant has been amortizing the total amount so transferred, namely $3,779,458 at the rate of $300,000 a year for 1956, 1957 and 1958, and plans to continue to do so in the future.

The two percent charge on the franchise paving allocated to track still in service was continued in 1956 and 1957; the amount charged off in 1957 was $94,-641. In 1958 defendant company increased the amortization of the remaining amount in said account to $246,085 as a result of a change in its estimated life of the track in service.

Since this action involves only the years 1957 and 1958, the charges then included in operating expenses, $94,641 and $246,085, respectively, under provision for depreciation, and amortization of $300,000 each year listed as an extraordinary item titled special appropriation for amortization of franchise paving, are drawn in issue here. This court is convinced that the item of franchise paving became worthless in 1953 when it was excluded from defendant's rate base and should have been written off as a loss at that time. For so long as this item was included in the rate base it constituted an asset for rate making purposes, and there was justification for its remaining on the books since it thereby contributed indirectly to revenues. Once it was excluded from the rate base it no longer offered any benefit to the operating revenue and should have been recognized and treated as a loss at that time.

There is no basis for defendant's contention that its treatment of franchise paving is correct because it is an intangible representing the amount paid at reorganization in 1940 by defendant to acquire the franchises of the predecessor company. Defendant itself treated the item as a tangible and amortized the same. Then, too, the reorganization proceedings cannot be equated to an arm's length bargain wherein franchise rights were acquired, but is rather merely an adjustment of the rights of the creditors and stockholders of the predecessor companies who continued as owners of defendant corporation. Moreover, were franchise paving properly considered an intangible, the amor-

tization thereof is not a permissible deduction in the computation of net income under article V, section 2, of the trust indenture.

The third item of charge or deduction which is challenged by plaintiff is the writing off of the sum of $666,112 in 1957 as an extraordinary item entitled "City repaving charge due to conversion program".

Repaving charges here discussed arose from three separate agreements with the City of Philadelphia wherein defendant agreed to make payments to the city in lieu of its franchise obligation to repave the streets upon abandonment of the track. Defendant's obligation to the city under the first of these agreements was $269,000 which was charged against earnings for the year 1955. The treatment of this type expenditure differed in 1956 for then it was decided to amortize the sum of $756,000 incurred in the second agreement over a period of seven years or at the rate of $108,000 per year. However, when defendant company agreed to pay $843,112 to the city under the third such repaving agreement, $177,000 thereof was charged against income for 1956, and the balance of $666,112, now contested, was written off in 1957.

This obvious inconsistency is amplified when it is revealed that for rate making purposes defendant sought and obtained from the Public Utility Commission the right to amortize the questioned sum of $666,-112 over a period of five years or at the rate of $133,-300 per year. We are constrained to the view that this charge will contribute to revenues for a five-year period; therefore the expense item should be written off over such period. This procedure is consistent with the rationale and principles adopted when treating with the item of franchise paving. It is also consistent with the accounting principle to which we adhere, namely of matching revenues with the expenses incurred in the earning of the same.

While mention is made of the Public Utility Commission and its orders, emphasis is laid upon the fact that the determination of this matter must be within the confines of sound accounting practice as limited by the trust indenture. Any action by the commission is deemed relevant only insofar as it bears on those items of expense allowable for rate making purposes. For then sound accounting practice may permit the carrying forward of expenditures which otherwise would be required to be charged off as no longer contributing to revenues.

Since this court found that the sum of $666,112 should be written off over a five-year span, the proper deduction or charge for the accounting item of repaving charge should be $241,300 for each of the years in dispute.

By reason of the disallowance of these deductions or charges there is, following the computation compelled by the trust indenture, net income available for the payment of income interest for the years 1957 and 1958.

The sole issue remaining is raised by the last count of plaintiff's second amended complaint. That is the right of plaintiff trustee to reimbursement for expenses and cost incurred in connection with the adjudication of this matter. Highlighting the background of this action is the fact that when plaintiff trustee was notified in 1957 that net income was not available for the payment of income interest to the bondholders, it employed with the approval of defendant a national firm of accountants to render an independent opinion on the issue. When, however, the accountants failed to confirm the position subscribed to by defendant, it persisted in its refusal to pay income interest but did pay the expenses incurred by plaintiff in securing the independent opinion.

The obtaining of a judicial determination of this conflict became imperative, but the means provided by article XIII, sec. 1, of the trust indenture were inadequate to meet the unusual involvements. This article permitted plaintiff trustee to ignore the opinion of the independent accountants until requested in writing by the holders of 25 percent of the principal amount of the bonds then outstanding to institute suit, and in addition to that request satisfactory security and indemnity for future expenses had to be furnished to the trustee by said bondholders. Since the bonds were widely held, there was no organization of bondholders who could make such a request and furnish such security. Moreover, defendant had published a newspaper notice to the effect that the coupons for the 1957 interest income were worthless. This announcement would tend to preclude organization of bondholders unless some affirmative measure was taken. It was these cumulative factors that precipitated the action of plaintiff trustee in instituting suit and giving public notice thereof to bondholders advising that the applicable interest coupons be retained.

The knowledge of the trustee gained by the independent opinion of the national firm of accountants when considered in the light of the other surrounding circumstances established its course of action as a commendable exercise of the fiduciary power and duty vested in it. Article XIII, sec. 1, of the trust indenture binds defendant to "reimburse the Trustee for all its expenditures, and to indemnify and save the Trustee harmless against any liabilities which it may incurr in the exercise and performance of its powers and duties hereunder."

Having decided that the action of the trustee was within its mandate, defendant's obligation to reimburse the fiduciary for the costs and expenses of its action is clear.

Article IX, sec. 11, of the indenture which permits

the trustee, upon suit for principal and interest upon default, to first apply the recovery to payment of costs and expenses of collection and expenses, disbursements and compensation of trustee, is not exclusive and does not limit the rights of the trustee to reimbursement under article XIII, sec. 1. Article IX, sec. 11, was inserted for the added protection of the trustee in the event it was required upon default to bring suit against defendant. Collection of the expenses and costs of a specific and foreseeable undertaking are thereby assured the trustee. The instant action falls within the general power of a fiduciary to obtain a judicial construction of a trust instrument. Certainly, after sanctioning the independent accountants' opinion and paying the costs thereof, defendant should not be permitted to ignore its import and thereby place the expense and costs of litigation upon the sole party charged with the responsibility as a fiduciary of protecting the rights and property of its beneficiaries, the bondholders. . . .

In view of the foregoing we have heretofore entered an order finding in favor of plaintiff trustee and against defendant on all counts of plaintiff's complaint.